---

**DISTRICT COURT OF THE VIRGIN ISLANDS**

**DIVISION OF ST. THOMAS AND ST. JOHN**

---

UNITED STATES OF AMERICA

       v.

HERNS SAJOUS,

            **Defendant.**

              **3:25-cr-00036-RAM-EAH**

TO:   **Kyle Payne, Esq., AUSA**
       **Christopher Opiel, Esq.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court for a bench trial on July 2, 2025. Defendant Herns Sajous, who waived his presence at the trial, *see* Dkt. No. 23, was represented by Attorney Christopher Opiel, and the Government was represented by Assistant United States Attorney Kyle Payne. The Government charged Mr. Sajous by Information with Illegal Entry by an Alien, in violation of 8 U.S.C. § 1325(a)(1). *See* Dkt. No. 12. After the close of the Government's evidence, Attorney Opiel moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, which the Court denied. Following the close of all evidence, he again moved for a judgment of acquittal, and the Court took the matter under advisement. For the reasons that follow, the Court will deny Mr. Sajous's motion for judgment of acquittal. However, in weighing the evidence presented, the Court finds that the Government did not meet its burden of proving Mr. Sajous's guilt beyond a reasonable doubt. Accordingly, the Court finds Mr. Sajous **NOT GUILTY** on Count One of the Information.

### BACKGROUND

Prior to trial, the parties made three stipulations: first, that Herns Sajous is a citizen

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 2

of Haiti; second that Mr. Sajous's date of birth is February 18, 1974; and third, that Herns Sajous was "the defendant who was selected for inspection at the Red Hook ferry terminal, and arrested on April 9, 2025, in St. Thomas, USVI by Homeland Security Investigations officers." Dkt. No. 27. The parties also stipulated to the admission of several exhibits.

At trial, the parties waived opening arguments. The Government called Special Agent Damita Furlonge ("SA Furlonge"), an officer with Homeland Security Investigations ("HSI") on St. Thomas, to testify. SA Furlonge testified that on April 9, 2025, she was working in the Red Hook Ferry Terminal, supporting Transportation Security Administration ("TSA") officers as they inspected passengers traveling between St. Thomas and St. John. SA Furlonge's duty was to use her computer to verify individuals' identifying documents and immigration status.

At some point on April 9, a TSA agent presented SA Furlonge with Mr. Sajous for secondary inspection, along with his employment authorization identification card, Virgin Islands driver's permit, and Haitian passport, which did not contain any visas or stamps for entry into the United States. SA Furlonge used her computer to query search Herns Sajous's name and his United States Citizenship and Immigration Services ("USCIS") number. During that query, she checked to see whether he had any pending immigration applications and whether his employment authorization card was valid. Her initial search revealed that Mr. Sajous had a file with the Department of Homeland Security ("DHS"). She testified that the first document she reviewed, which was admitted as Government's Exhibit 5, revealed that Mr. Sajous had entered the country on January 2, 2024 and opened a file with DHS on January

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 3

7, 2024. The record labeled his Port of Entry as "St. John" and noted that he had a pending asylum application.

SA Furlonge testified that she conducted several other searches of Mr. Sajous through other databases that she had access to. A search of the "Person Centric Identity Services" database returned an "Identity Details" page, which was admitted as Government's Exhibit 7. That document listed Mr. Sajous's immigration status as "Temporary Presence Authorized," ("TPA"). It stated that his TPA status was granted on January 2, 2024, the same date listed as his date of entry into the United States. According to SA Furlonge, TPA is a grant of permission to be present in the United States for a limited time and is often granted when an asylum application is pending. SA Furlonge testified that USCIS must have backdated Mr. Sajous's authorization to be present in the United States to the date of his entry, since other documents revealed that his immigration application was originally filed on January 7, 2024. SA Furlonge testified that she did not know why USCIS would backdate the TPA status.

SA Furlonge further testified that the only way a person can legally enter the United States is by presenting themselves to a Customs and Border Protection ("CBP") officer at a designated port of entry. She testified that no other agent is authorized to permit legal entry into the United States. She also testified that designated ports of entry are locations specifically set up by DHS and CBP where persons are permitted to make entry into the United States. Designated ports of entry on St. Thomas include the Cyril E. King Airport and the Blyden Ferry Terminal. The designated port of entry on St. John is the Coral Bay Seaport. SA Furlonge said that USCIS buildings are not designated ports of entry and that presenting

oneself to a USCIS agent, even immediately upon arrival into the United States, would not constitute legal entry because USCIS buildings are not designated as appropriate places for legal entry.

While providing this background, SA Furlonge testified as to the contents of Government's Exhibit 9, a CBP "Person Query – Encounter History Hit List," which she also reviewed on April 9, 2025. The "Hit List" pulls data from across the United States to show whether an individual had ever been screened by CBP officers at a port of entry. According to SA Furlonge, if a person had entered the United States lawfully, the "Person Query" would show the contact with CBP officers. The query as to Mr. Sajous revealed that he had no contacts with CBP, indicating that he did not legally enter the United States.

SA Furlonge's records check revealed that Mr. Sajous did not have "advanced parole," a document that allows an alien to leave the United States and then return lawfully, nor did he have lawful permanent resident status. Therefore, after running her systems checks and reviewing the records described above, and based on the lack of documents showing legal entry, SA Furlonge determined that Mr. Sajous had entered the United States illegally. Consequently, she handcuffed him and transported him to the HSI office to perform a biometric verification.[1]

---

[1] The Court pauses here to express some concern with the lawfulness of Mr. Sajous's arrest. By the time he was handcuffed and transported, Mr. Sajous was surely seized for the purposes of the Fourth Amendment. *See Torres v. Madris*, 592 U.S. 306, 312 (2021) ("the arrest of a person is quintessentially a seizure"). At the time of Mr. Sajous's arrest, SA Furlonge had probable cause only to believe that Mr. Sajous had entered the United States illegally. Illegal entry is a misdemeanor offense. *See United States v. Laville*, 480 F.3d 187, 191 (3d Cir. 2007). In the Virgin Islands, as in a vast majority of states, "a misdemeanor must be

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 5

On cross-examination, SA Furlonge testified that she encountered Mr. Sajous for the first time on April 9, 2025 and that he did not have any criminal charges pending against him at that time. The employment authorization, driving permit, passport, and other documents she reviewed were authentic. She said that Mr. Sajous was not alleged to have committed any offenses other than the illegal entry on January 2, 2024 and that she did not witness that entry. The only knowledge she had that Mr. Sajous entered the country on January 2, 2024 came from the DHS documents she reviewed, which based Mr. Sajous's date of entry on his own responses to inquiries on his immigration application documents. She admitted that

---

committed in the presence of the [arresting] officer in order to justify a warrantless arrest." *Id.* (citing 5 V.I.C. § 3562(1)). That law is congruent with a long-held understanding in federal law that "[t]he usual rule is that a police officer . . . may only arrest without a warrant one guilty of a misdemeanor if committed in his presence." *Carroll v. United States*, 267 U.S. 132, 156-57 (1925). That "usual rule" finds significant support throughout the United States's history and the history of the common law. *See Gonzalez v. United States*, 145 S. Ct. 529, 530-33 (2025) (Sotomayor, J., joined by Gorsuch, J., statement respecting denial of cert.) (discussing historical support for the "in-the-presence requirement" dating back to English common law and continuing through the founding of the United States "almost without exception"). While several circuit courts have held that the Fourth Amendment no longer protects persons from warrantless arrests for misdemeanors committed outside an officer's presence, *see id.* at 531-32 (collecting cases), the Third Circuit has not ruled on the validity of the in-the-presence requirement under the Fourth Amendment. *Cf. Laville.* 480 F.3d at 193 (rejecting *per se* rule that violation of Virgin Islands in-the-presence law automatically made arrest unconstitutional, but not addressing validity of in-the-presence requirement under the Fourth Amendment). Because the Fourth Amendment "must provide *at a minimum* the degree of protection it afforded when it was adopted," *Lange v. California*, 594 U.S. 295, 309 (2021) (emphasis in original), and because warrantless arrests of misdemeanants were generally prohibited for crimes committed outside of an officer's presence at the nation's founding, the Court questions whether Mr. Sajous's warrantless arrest was lawful under the Fourth Amendment. The Court's concern is made all the more serious because SA Furlonge's records checks revealed that Mr. Sajous was lawfully permitted to be present in the United States at the time he was arrested. Nevertheless, the Defendant did not raise this issue, and the Court does not consider whether the arrest was, in fact, unlawful.

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 6

there may have been immigration documents that she did not have access to. For example, she was unable to access Mr. Sajous's asylum application. Attorney Opiel presented the application to SA Furlonge as Defense Exhibit A, and she acknowledged that she had never seen it prior to that day.

On redirect examination, SA Furlonge explained the contents of Government's Exhibit 6, which contained two documents detailing the contacts Mr. Sajous had with DHS personnel. According to SA Furlonge, one document showed a contact between Mr. Sajous and USCIS personnel on January 30, 2024 that had something to do with his asylum application. That contact, she testified, appeared to have been the only other in-person contact Mr. Sajous had with any DHS agents prior to her encounter with Mr. Sajous on April 9, 2025. She explained that this likely meant that Mr. Sajous filed his January 7, 2024 asylum application online, and that it was not until January 30, 2024 that he met USCIS officials in-person for the first time. The other document in Government's Exhibit 6 was created by her inquiry into Mr. Sajous on April 9, 2025.

After the Government rested, Attorney Opiel moved for a judgment of acquittal, which the Court denied. He then argued that if Mr. Sajous violated 8 U.S.C. § 1325(a)(1), he did so under duress. His asylum application, Defense Exhibit A, established that he was fleeing Haiti due to his well-founded and serious belief that his life was in danger there. The Government responded that Mr. Sajous's asylum application did not constitute sufficient evidence to establish a duress defense. But even assuming that Mr. Sajous met the initial burden of establishing entitlement to a duress defense, he failed to establish all of the elements of

duress because even if he was fleeing danger in Haiti, he could have avoided his illegal conduct by entering the United States legally, at a designated port of entry.

Attorney Opiel also asserted that the Government had not met its burden to prove that Mr. Sajous had entered the country illegally beyond a reasonable doubt. He emphasized (1) SA Furlonge's admissions that there were documents she did not have access to and could not review; and (2) that she had virtually no knowledge regarding Mr. Sajous's entry into the United States aside from his immigration applications in which he stated that he entered the country on January 2, 2024. Attorney Payne responded by saying that it was irrelevant what date Mr. Sajous entered because his presence in the United States without any evidence of a lawful entry was sufficient to demonstrate that he entered illegally. The fact that he was now lawfully present in the United States did not absolve him of his initial unlawful entry. The violation of § 1325 occurred and ended the moment he entered the country. Based on SA Furlonge's testimony that only CBP agents can designate the proper time and place for legal entry, he argued that any alien who does not have a record of contact with CBP at the moment they set foot in the country has necessarily entered illegally.

At the close of trial, the Court questioned the Government as to whether it was required to prove any specific *mens rea*. The Government asserted that § 1325 was not a strict liability crime, but it deflected the Court's attempts to categorize what *mens rea* attached to which elements of § 1325. Instead, it stated that regardless of § 1325's potential knowledge requirements, it had met its burden of showing the appropriate *mens rea* as to all elements beyond a reasonable doubt.

## DISCUSSION

### I.    The Crime of Illegal Entry

Title 8 Section 1325(a)(1) provides:

> Any alien who . . . enters or attempts to enter the United States at any time or place other than as designated by immigration officers . . . shall, for the first commission of any such offense, be fined under title 18 or imprisoned not more than 6 months, or both[.]

8 U.S.C. § 1325(a)(1). Understanding who is an "alien" and who is an "immigration officer" is straightforward. The Immigration and Nationality Act ("INA"), of which 8 U.S.C. § 1325 is a provision, defines "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). "Immigration officer" is defined as "any employee or class of employees of the Service[2] or of the United States designated by the [Secretary of Homeland Security],[3] individually or by regulation, to perform the functions of an immigration officer." 8 U.S.C. § 1101(a)(18). A separate regulation provides:

> Immigration officer means the following employees of the Department of Homeland Security, including senior or supervisory officers of such employees, designated as immigration officers authorized to exercise the powers and duties of such officer as specified by the Act and this chapter I: aircraft pilot, airplane pilot, asylum officer, refugee corps officer, Border Patrol agent, contact representative, deportation officer, detention enforcement officer, detention officer, fingerprint specialist, forensic document analyst, general attorney (except with respect to CBP, only to the extent that the attorney is performing any immigration function), helicopter pilot,

---

[2] The INA was signed into law before DHS existed, when the Immigration and Naturalization Service, an agency in the Department of Justice, oversaw most immigration-related issues. Parts of the statute still anachronistically refer to the Immigration and Naturalization Service, or "the Service."

[3] The statute's text actually authorizes the U.S. Attorney General to designate individuals as immigration officers. However, later amendments to the INA granted that and other authority to the Secretary of Homeland Security. *See* 8 U.S.C. § 1103(a).

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 9

> immigration agent (investigations), immigration enforcement agent, immigration information officer, immigration inspector, immigration officer, immigration services officer, investigator, intelligence agent, intelligence officer, investigative assistant, special agent, other officer or employee of the Department of Homeland Security or of the United States as designated by the Secretary of Homeland Security as provided in 8 CFR 2.1.

8 C.F.R. § 1.2. Thus, virtually any DHS official whose duties relate in some way to the enforcement of immigration activities qualifies as an "immigration officer."

However, "[n]either the [INA] nor the regulations provide a definition of the phrase 'place other than as designated by immigration officers.'" *United States v. Aldana*, 878 F.3d 877, 880 (9th Cir. 2017). The regulations do provide that "[a]pplication to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port of entry when the port is open for inspection, or as otherwise designated in this section." 8 C.F.R. § 235.1(a). Another regulation lists ports of entry for aliens arriving by sea or land. 8 C.F.R. § 100.4. The list does not include specific locations. Rather, it describes ports of entry as geographic regions across the United States. In the Virgin Islands, for example, the ports of entry on St. John are Cruz Bay and Coral Bay,[4] as well as Charlotte Amalie and Red Hook on St. Thomas, and Christiansted and Frederiksted on St. Croix. *Id*.

The Court could find only one case in which a court defined the phrase "place other than as designated by immigration officers" in § 1325(a)(1). In *Aldana*, two defendants challenged their § 1325(a)(1) convictions by arguing that the prosecution was required to

---

[4] Coral Bay, St. John, is defined as a "Class B" port-of-entry, meaning that only aliens who are exempt from certain document requirements may be admitted into the country there. *See* 8 C.F.R. § 100.4(a). The various types of ports of entry are irrelevant to the instant issues pertaining to Mr. Sajous.

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 10

prove that they entered the country at some place other than at one of the geographical regions designated as ports of entry in 8 C.F.R. § 100.4. 878 F.3d at 878. Reviewing § 1325, its precursor statutes, the above-described regulations, and the history of those regulations, the Ninth Circuit determined that "the phrase 'a place other than as designated by immigration officers' in § 1325(a)(1) [refers] to *any place other than immigration facilities at designated ports of entry*, as contemplated by [8 C.F.R.] § 235.1(a)." 878 F.3d at 882 (emphasis added).[5]

But unless a statute's text is ambiguous, the "plain meaning of the text should be conclusive." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 317 (3d Cir. 2008). Additionally, courts should not supply an unambiguous statute with omitted language, even if the addition of some language would lead to a more reasonable result. *See Comm'r of Internal Revenue v. Asphalt Prods. Co, Inc.*, 482 U.S. 117, 121 (1987) ("Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) (describing the "omitted-case canon," which dictates that "[n]othing is to be added to what the text states or reasonably implies").

In the case of § 1325, the text is unambiguously clear: it criminalizes entry at any place other than *as designated by immigration officers.* Despite this unambiguity, the Ninth Circuit

---

[5] The Ninth Circuit, apparently, left consideration of the word "time" in § 1325(a)(1) out of its analysis.

changed the statute's meaning to criminalize any entry not designated as a legal entry according to DHS regulations. But the plain text of the statute does not, in fact, criminalize an alien's entry at any place *other than* as described in 8 C.F.R. § 235.1(a), or at any place *other than* as designated by DHS regulations. Put simply, contrary to the conclusion reached in *Aldana*, there may be some entries by aliens that are not legal according to DHS regulations, but that are also not criminally *illegal* under § 1325(a)(1).[6] Thus, the Government must prove more than that a defendant was in the country without having entered the country legally. Rather, § 1325 "requires the government to prove how the entry was effected," *United States v. Flores-Peraza*, 58 F.3d 164, 168 (5th Cir. 1995), and that the entry was made without authorization from any immigration officers. As noted above, the list of immigration officers in 8 C.F.R. § 1.2 is long and includes USCIS agents and other immigration officials. Thus, if a USCIS agent designates a place and time as appropriate for entry, an alien who enters the country at that place and time has not violated 8 U.S.C. § 1325, notwithstanding the fact that the alien may not have entered the country at the "immigration facilities at designated ports of entry, as contemplated by § 235.1(a)" described in *Aldana.*

In sum, the Ninth Circuit's definition of § 1325 ignores the law's unambiguous meaning, contradicts the statute's plain language, and impermissibly expands § 1325's reach

---

[6] It would be irrelevant if the Court thought that this outcome was unreasonable or contrary to Congress's intention. *See Asphalt Products,* 482 U.S. at 121. Nevertheless, the Court notes that it is reasonable that Congress would seek to criminalize only some entries made outside of DHS's regulatory framework, because those entries—made without permission from any immigration officers—constitute a more egregious violation of the law and a greater threat to the public welfare than entries permitted by immigration officers.

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 12

to criminalize more conduct than encompassed by the statute.[7] But the crime of *illegal* entry

is not the crime of disobeying the country's regulatory framework for *legal* entry. If it were,

Congress would have said so.[8] Therefore, the Court rejects the Ninth Circuit's definition of

"place other than as designated by immigration officers" and instead reads the statute to

mean exactly what it says.

---

[7] To reach its conclusion, the Ninth Circuit looked at § 1325 "in light of [its] historical context," *Aldana*, 878 F.3d at 882, and held that anyone who fails to enter the country through the mechanisms described in complex and convoluted regulations is guilty of a criminal offense. However, in the Third Circuit, at least, a court should only consider a statute's legislative history if its plain meaning is ambiguous, and even then, it should consider the history "with caution." *Lawrence*, 527 F.3d at 317. Nevertheless, looking at the legislative history, the Court concludes that it does not support the holding in *Aldana*. As the *Aldana* court explained, the earliest version of § 1325 explicitly referenced ports of entry, providing that anyone who entered the United States "by water at any time or place other than as designated by immigration officials, or by land at any place other than one designated as a port of entry for aliens" shall "be taken into custody and deported." 878 F.3d at 880, n.4. (quoting Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889). However, in 1929, Congress removed the reference to ports of entry in the statute and converted the statute into a criminal, misdemeanor offense. *Id.* (citing Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2, 45 Stat. 1551, 1551). Since designating illegal entry as a criminal offense, Congress has not reintegrated the "port of entry" language. *Id.* This history indicates that Congress was aware that it could have criminalized any entry that was not made at a designated port of entry, but expressly chose not to do so.

[8] To the extent that the Ninth Circuit's analysis of § 1325(a)(1) relied on or created any ambiguity in the interpretation of the statute, the Court notes that ambiguity in a statute must "be interpreted in favor of the defendants" subjected to it. *United States v. Santos*, 553 U.S. 507, 514 (2008) (the "venerable" rule of lenity "vindicates the fundamental principle" that no person "should be held accountable for a violation of a statute whose commands are uncertain" and "places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead"). The interpretation in *Aldana* does the exact opposite. It requires alien defendants to possess a robust understanding of the history of immigration regulations and statutes in the United States to realize that, despite the statute's plain language, they are permitted to arrive only in certain places, even when an immigration officer permits their entry elsewhere. This interpretation does not comport with the statute's plain language or with the rule of lenity.

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 13

Having defined the key textual features of § 1325, the Court must confront the fact that § 1325 is silent as to any *mens rea* requirements. "The fact that the statute does not specify any required mental state, however, does not mean that none exists." *Elonis v. United States*, 575 U.S. 723, 734 (2015). The Third Circuit has not determined the scope of § 1325(a)(1)'s *mens rea* requirements. *See United States v. Syder*, No. 24-1145, 2025 WL 40852, at *1 n.2 (3d Cir. Jan. 7, 2025) (the Circuit "has never squarely addressed" the intent required to prove illegal entry under § 1325(a)(1)). Nor, does it seem, has any other district court in this Circuit.[9] Therefore, the Court must determine whether proof of any *mens rea* is an essential element of violating § 1325(a)(1) that the Government must prove beyond a reasonable doubt before it can proceed.

### A. *Mens Rea*

"[T]he 'general rule' is that a guilty mind is 'a necessary element in the indictment and proof of every crime.'" *Elonis*, 575 U.S. at 734 (quoting *United States v. Balint*, 258 U.S. 250, 251 (1922)). However, there are exceptions for certain types of crimes, often called "regulatory" or "public welfare" offenses in which "the proscribed conduct is not morally wrong, but it is criminalized because it impacts negatively on some aspect of public welfare." *Francis v. Government of the Virgin Islands*, 236 F. Supp. 2d 498, 501 (D.V.I. 2002).[10] To

---

[9] Notably, courts in this Circuit have rejected the contention that a similar statute, 8 U.S.C. § 1326, which criminalizes illegal *reentry* by an alien, is a strict liability offense. *See United States v. Nwene*, 20 F. Supp. 2d 716, 719 n.5 (D.N.J. 1998).

[10] Certain other offenses are categorically prohibited, regardless of the offender's *mens rea*, because society has deemed those crimes so reprehensible as to justify severe punishment notwithstanding a lack of intent to commit the crime. *Francis*, 236 F. Supp. 2d at 502 (describing statutory rape as such a crime). The Government has not suggested that illegal

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 14

determine whether § 1325(a)(1) is a public welfare offense, the Court must look at "the peculiar nature and quality of the offense," *Morissette v. United States*, 342 U.S. 246, 259 (1952), and consider whether the criminalized conduct is that which "a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety." *Liparota v. United States*, 471 U.S. 419, 433 (1985).[11] The Court must also consider the penalty attached to a violation of the statute. *Staples v. United States*, 511 U.S. 600, 616 (1994) ("Historically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea*."). Indeed, some "commentators . . . have argued that offenses punishable by imprisonment cannot be understood to be public welfare offenses, but must require *mens rea*." *Id.* at 617.

Against this backdrop, the intent necessary to prove illegal entry has not been well-defined by courts across the country. *Compare United States v. Rizo-Rizo*, 16 F.4th 1292, 1297, 1299 (9th Cir. 2021) (because crossing international borders is a type of conduct generally subject to stringent public regulation, § 1325 is a regulatory offense and "knowledge of

---

entry is a crime worthy of such moral approbation, and the Court does not consider illegal entry such a crime.

[11] For example, the Supreme Court has noted that hand grenades are so inherently dangerous "that possession of hand grenades is not an innocent act," and therefore any reasonable person would recognize that owning a hand grenade is likely circumscribed by law. *United States v. Freed*, 401 U.S. 601, 609 (1971). However, there are myriad innocent reasons to possess food stamps even if you are not legally authorized to do so, and the Supreme Court has held that it is therefore improper to define unauthorized possession of food stamps as a strict liability crime. *Liparota*, 471 U.S. at 432-33.

alienage is not an element of § 1325(a)")[12] *with Syder*, 2025 WL 40852, at *2 (holding that the Government was "required to prove that [defendant] knowingly entered the United States," while declining to determine to what extent knowledge applies as an element of § 1325) *and* Pattern Crim. Jury Instr. 5th Cir. 2.02A, Illegal Entry, 8 U.S.C. § 1325(a)(1) (2024) (Government must prove defendant knowingly entered the United States).

Although "reasonable people," *Liparota*, 471 U.S. at 433, across the world understand and accept that national borders are subject to "stringent public regulations," *id.*, a reasonable person would assume that they could avoid penalties resulting from crossing a border, such as deportation or criminal sanctions, so long as they received permission to reside in the country from the country's immigration officials. Accordingly, while most people understand that they cannot walk, sail, or fly into a different country without speaking to some immigration authorities, they do not expect to have to speak to any *specific* immigration authorities in order to avoid criminal sanctions.

Thus, when a reasonable person enters the United States and immediately reports their entry to immigration officers, and those officers do not detain or otherwise redirect the person—and particularly when those immigration officers provide a document authorizing the person to be in the country backdated to the date of the person's entry—that person

---

[12] Although the Ninth Circuit in *Rizo-Rizo* defined § 1325(a)(1) as a "regulatory offense," the Court was solely addressing whether an intent requirement attached to the alienage element of the offense. The Ninth Circuit offered no analysis of whether the second element, entry into the United States at a place or time other than authorized by immigration officers, requires proof of a *mens rea*.

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 16

would reasonably have little expectation that they may have violated the law.[13] Moreover, the fact that § 1325 attaches a potential term of imprisonment weighs against reading it as a strict liability crime. *See Staples*, 511 U.S. at 617 (collecting cases questioning whether strict liability can ever be read into a statute imposing potential term of imprisonment); *United States v. Ohio Barge Lines, Inc.*, 607 F.2d 624, 628 (3d Cir. 1979) (rejecting interpretation of offense as strict liability crime "primarily because a violation . . . exposes one to criminal sanctions . . . including possible imprisonment" of up to one year). Finally, it must be acknowledged that the Government bears the burden of proving that a statute imposes strict liability for an offense, but here it expressly argued against treating § 1325 as a regulatory offense.

These considerations, along with the general "rule against reading a statute as abandoning a requirement of knowledge unless the statute exhibits such a deliberate legislative choice," *Government of the Virgin Islands v. Rodriguez*, 423 F.2d 9, 14 (3d Cir.

---

[13] Furthermore, the Court questions whether a reasonable person would expect that entering the country impermissibly would result in prison time, rather than temporary detention followed by deportation to the individual's home country. Indeed, the earliest version of § 1325 stated in full:

> [A]ny alien who shall have entered the United States by water at any time or place other than as designated by immigration officials, or by land at any place other than one designated as a port of entry for aliens by the Commissioner General of Immigration, or at any time not designated by immigration officials, or who entering without inspection, shall, upon the warrant of the Secretary of Labor, be taken into custody and deported.

Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. Although the statute provided the Executive with authority to take an illegal entrant into custody, it did not attach any criminal penalties or term of imprisonment for an illegal entry. This key distinction further suggests that the modern *criminal* version of the statute should not be considered a regulatory offense.

1970), lead the Court to find that some *mens rea* requirement attaches to § 1325. In this Circuit, when a law is silent as to *mens rea*, the presumptive intent attached to criminal charges is "knowledge." *See id.* at 12. The Court sees no reason to deviate from that presumption.

Thus, the remaining question is what the Government must prove the defendant knew to obtain a conviction under § 1325(a)(1). The answer is straightforward: Section 1325 does not make *entering the country* illegal, even for aliens. Rather, the statute criminalizes *entering the country anywhere other than at those specific places or times authorized for entry by an immigration officer*. The plain text does not separate out the *entry* element from the "*other place or time*" element but rather combines them. *See, e.g., Rizo-Rizo*, 16 F.4th at 1295 (because convictions for attempt require proof of a specific intent, when charging attempted illegal entry in violation of § 1325 the government must prove that the person "specifically intended to enter the United States at a time or place other than as designated by immigration officers," not merely that the person specifically intended to "enter the United States"). Accordingly, reading the "knowledge" requirement into the statute, the Government must prove that the defendant 1) is an alien; 2) who *knowingly*[14]

---

[14] The Court notes the irony of adding an absent word into a statute after discussing the importance of the "case-omitted canon." However, unlike the conduct criminalized in § 1325, which is patently clear, the absence of a *mens rea* in any criminal statute is so uniquely in contradiction to fundamental legal principles that it creates something of a *per se* ambiguity in a statute, permitting the Court to look beyond the plain language of the statute to determine whether omission of an intent requirement is appropriate. *See, e.g., Elonis*, 575 U.S. at 734 (criminal statutes are generally interpreted "to include broadly applicable scienter requirements, even where the statute by its terms does not contain them.") (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 70 (1994)).

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 18

entered the United States at any time or place other than as designated by immigration

officers.[15]

## II.    Defendant's Motion for Judgment of Acquittal

Having determined what the Government was required to prove, the Court can now

turn to whether it has met its burden. Following the close of evidence, Attorney Opiel argued

that the Government had not met its burden of proof and moved for a judgment of acquittal.

The Court now denies that motion.

### A.  Legal Standard

Rule 29 provides that "after the close of all the evidence, the court on the defendant's

motion must enter a judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When considering a Rule 29

motion, the Court must review the record in the light most favorable to the prosecution.

*United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006). Moreover, the Court must "be ever

vigilant" to avoid "weighing credibility and assigning weight to the evidence." *United States*

---

[15] Of course, ignorance of the law is generally no excuse for committing an offense. Nevertheless, a "defendant generally must 'know the facts that make his conduct fit the definition of the offense.'" *Elonis*, 575 U.S. at 735 (quoting *Staples*, 511 U.S. at 608 n.3). So, for example, an alien who entered the United States and then avoided all contact with immigration officials cannot claim that they did not know they needed to enter the country at a place designated as proper by immigration officers. However, a person who immediately upon entry to the United States reports himself to an immigration officer—albeit to the "wrong" officer according to the Government—has a strong defense that he did not knowingly enter the United States at a time or place other than as designated by immigration officers. This is especially true if the immigration officers do not redirect him to the "right" immigration officers and permit him to lawfully remain in the United States as of the date of his initial entry.

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 19

*v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). In short, the Court should not act as a finder of

fact when considering a Rule 29 motion. Instead, the court is limited only to considering

whether a factfinder *could* permissibly find that there was sufficient evidence to support a

defendant's conviction. *See id.; see also United States v. Frett*, 492 F. Supp. 3d 446, 449 (D.V.I.

2020).

### B.  Application

The Government's evidence showed that Mr. Sajous—an alien from Haiti—was

present in the United States without having ever encountered any CBP agents. *See*

Government's Ex. 9. The Government also presented evidence that Mr. Sajous entered the

United States on January 2, 2024, but did not open a file with any DHS officials until January

7, 2024, five days after his entry. *See* Government's Ex. 5.

While the Government presented no evidence regarding Mr. Sajous's actual entry

aside from that it occurred on January 2, 2024, the lack of contact with any border officials

indicates that, at the point of Mr. Sajous's entry into the country, he arrived at a place or time

that was not designated by immigration officers as proper for entry. Moreover, the fact that

Mr. Sajous ultimately went to immigration officials five days after his entry into the country

could lead a reasonable juror to find that Mr. Sajous knew, on the date he entered the country,

that his time or place of entry was not designated by immigration officers as proper.

Considering this evidence in the light most favorable to the prosecution, the Court holds that

the Government presented sufficient evidence to allow a reasonable juror to find Mr. Sajous

guilty of violating § 1325(a)(1), and must therefore deny Mr. Sajous's motion for judgment

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 20

of acquittal.

### III.    Judgment as a Fact Finder

As a trier of fact no longer bound to view the evidence in the light most favorable to the Government, the Court must now assign weight to the evidence presented to determine whether the Government has met its burden of proving that Mr. Sajous was guilty of violating each element of § 1325 beyond a reasonable doubt. As to the first element—whether Mr. Sajous is an alien—the Court finds that the Government sufficiently proved Mr. Sajous's alienage by providing his Haitian passport, *see* Government's Exhibit 1, and by showing, through several DHS documents, that Mr. Sajous had not been granted United States citizenship or been nationalized. *See, e.g.,* Government Ex. 7; *see also* Dkt. No. 27 (stipulation of the parties stating that Mr. Sajous "is a citizen of Haiti").

However, the Court cannot find that the Government provided sufficient evidence to demonstrate that Mr. Sajous knowingly entered the United States at a time or place other than as designated by an immigration officer. While providing some evidence suggesting that Mr. Sajous made his first contact with immigration officials on January 7, 2024, five days after his entry into the United States, the Government's only witness, SA Furlonge, testified that she did not have access to every document that might reveal Mr. Sajous's contacts with DHS officials. As just one example, she stated that she had not seen Mr. Sajous's asylum application, despite her various record checks, until it was presented to her when she was sitting on the witness stand. With the burden on the Government to prove guilt and with little evidence regarding Mr. Sajous's actual entry, it is difficult to find that the entry was

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 21

made illegally beyond a reasonable doubt, given that there may have been documents demonstrating that Mr. Sajous had certain contacts with immigration officers that SA Furlonge had not been able to access.

More to the point, the Court cannot find that Mr. Sajous knowingly entered the country at a time or place other than as designated by immigration officers. First, the Court must make clear that SA Furlonge's legal conclusion, and Attorney Payne's argument, that only CBP agents can designate appropriate places of entry is unsupported by law, at least for the purposes of § 1325. Instead, the criminal law penalizes only those entries made at a time or place other than where designated by immigration officers—which includes dozens of different types of agents aside from CBP agents, *see* 8 C.F.R. § 1.2

The parties agree that Mr. Sajous contacted USCIS agents on at least January 30, 2024, if not January 7, 2024.[16] The agents of USCIS undoubtably fall within the category of "immigration officers" defined in 8 C.F.R. § 1.2. And, according to SA Furlonge, USCIS agents authorized Mr. Sajous's presence in the United States as of January 2, 2024. Although the evidence tends to suggest that this authorization was backdated, there is no doubt that Mr.

---

[16] Based on the evidence presented, the Court does not fully understand what contacts Mr. Sajous had with immigration officers on January 7, 2024 compared to January 30, 2024. SA Furlonge speculated that Mr. Sajous filed his asylum application online on January 7, but she did not seem certain. That Government's Exhibit 6, which purportedly demonstrated all contacts DHS officials had with Mr. Sajous, did not contain any information regarding Mr. Sajous's immigration-related actions on January 7, 2024, further leads the Court to question the completeness of the records SA Furlonge was able to review. Regardless, the Court finds the date that Mr. Sajous was authorized to be in the United States, not the dates of his contacts with DHS officials, to be most significant, and there is no dispute that the date he was authorized to be in the United States was January 2, 2024, the same day he purportedly entered the United States.

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 22

Sajous was permitted to be *in* the United States on January 2, 2024. *See* Government's Ex. 7. It is difficult to understand how an immigration officer who intentionally authorized Mr. Sajous to be in the United States beginning on January 2, 2024, the date of his arrival, did not also authorize Mr. Sajous to enter the United States on that same date.

More critically, the Court fails to see how Mr. Sajous—who went to immigration officers, reported his arrival in the United States, and sought lawful status that was backdated to the date of his entry—would know that his entry did not occur at "a time or place other than as designated by immigration officers" when an immigration officer specifically authorized Mr. Sajous's presence in the country on the date of his entry. Indeed, the only reason Mr. Sajous would have gone to immigration officers in the first place was in an effort to make his entry and his presence lawful after crossing an international border. When those same immigration officers permitted him to be in the country as of the date of his entry, and never directed him to go to different immigration officers or to do anything else to be in compliance with the law, he would have been hard-pressed to know that the place and time of his entry was improper. Consequently, the Court finds that, based on the evidence presented at trial, there is at least a reasonable doubt as to whether Mr. Sajous knowingly entered the United States at a time or place other than as designated by immigration officers.[17] The Court therefore finds him not guilty of violating 8 U.S.C. § 1325(a)(1).

---

[17] Because the Court finds that the Government has not met its burden of proof, the Court need not and does not consider Mr. Sajous's affirmative defense of duress.

*United States v. Sajous*
3:25-cr-00036-RAM-EAH
Memorandum Opinion and Order
Page 23

## CONCLUSION

The Court rests its decision on the fundamental fact, so essential to our criminal legal system, that the Government bears the burden of proving that the defendant committed each element of the crime charged beyond a reasonable doubt. The Government did not meet its burden of proof in this case. Accordingly, the Court hereby **FINDS** that Mr. Sajous is **NOT GUILTY** of Count One of the Information, entering the United States at a time or place other than as designated by an immigration officer in violation of 8 U.S.C. § 1325(a)(1). An appropriate Judgment of Acquittal accompanies this Memorandum Opinion and Order.

Furthermore, the Court hereby **ORDERS**:

1. Mr. Sajous's oral Motion for Judgment of Acquittal is **DENIED**.

2. The Clerk of Court is directed to mark this case as **CLOSED**.

ENTER:

Dated: July 25, 2025

/s/ Emile A. Henderson III
EMILE A. HENDERSON III
U.S. MAGISTRATE JUDGE